1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZEST ANCHORS, LLC d/b/a Zest DentalSolutions and ZEST IP HOLDINGS, LLC,<br><br>                                 Plaintiffs,<br><br>v.<br><br>GERYON VENTURES, LLC d/b/a DESS-USA and TERRATS MEDICAL SOCIEDAD LIMITADA,<br><br>                                 Defendants. | Case No.:  22-CV-230 TWR (NLS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>(ECF No. 15) |

Presently before the Court is the Motion for Preliminary Injunction ("Mot.," ECF Nos. 15 (public), 26 (sealed)) filed by Plaintiffs Zest Anchors, LLC, doing business as Zest Dental Solutions ("Zest"), and Zest IP Holdings, LLC ("Zest IP"), as well as the Response in Opposition ("Opp'n," ECF No. 36) filed by Defendants Geryon Ventures, LLC, doing business as DESS-USA ("Geryon"), and Terrats Medical Sociedad Limitada ("Terrats") (together, "DESS") and Plaintiffs' Reply in Support of ("Reply," ECF Nos. 40 (public), 47 (sealed)) the Motion.  The Parties declined to offer live testimony, and the Court held a hearing on June 9, 2022.  (*See* ECF No. 48.)  Having carefully considered Plaintiffs' Complaint ("Compl.," ECF No. 1), the record, the Parties' arguments, and the relevant law, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion as follows.

1

**BACKGROUND**

## I.   Zest and Its LOCATOR® Products

Max Zuest founded Zest in 1972.  (*See* ECF No. 40-2 ("Supp. Towse Decl.") ¶ 4; ECF Nos. 15-1 (public) and 26 (sealed) ("Stratton Decl.") ¶ 4.[1])  "Since 1972, Zest has been a global leader in the research, development, and manufacturing of dental attachment products that are used to secure prosthetic dentures." (Stratton Decl. ¶ 4.)  Although Zest's products have evolved over time, (*see* Supp. Towse Decl. ¶¶ 3–9), the specific products that are the focus of this action—Zest's suite of LOCATOR® attachment products (the "LOCATOR® Product Suite")—have been on the market for approximately twenty years. (*See* Stratton Decl. ¶¶ 5, 7, 9–10.)

The LOCATOR® Product Suite consists of the following components, which are also depicted numerically in Figure 1: (1) the dental implant, which is an implant, bar, or root connector in the form of a small bone screw that is anchored directly into the patient's jaw; (2) the abutment, which is screwed into the dental implant using a torquing tool; (3) a color-coded retention insert; and (4) a denture housing or cap.  (*See* ECF No. 15-2 ("Towse Decl.") ¶ 5; *see also* ECF No. 15-3 ("Scherer Decl.") ¶ 9.)

/ / /

---

[1] Defendants object to the declarations submitted by Tom Stratton, Zest's President and Chief Executive Officer, and Ross Towse, Zest's Chief Operations Officer, on the grounds that they only began working at Zest in October 2018, (*see* Stratton Decl. ¶¶ 1–2), and February 2016, (*see* ECF No. 15-2 ("Towse Decl.") ¶¶ 1–2), respectively, and therefore lack personal knowledge of Zest's activities predating their employment.  (*See* Opp'n at 17 n.6, 20 n.8.)  The Court **OVERRULES** this objection for two reasons: First, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings[,]" and, accordingly, the district court need not rely only on admissible evidence.  *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (citing *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988)).  Second, in any event, the declarations are not objectionable because "[p]ersonal knowledge can be inferred from a declarant's position within a company or business." *See Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1201 (C.D. Cal. 2007) (collecting cases); *see also Salgado v. Iqvia, Inc.*, 459 F. Supp. 3d 1318, 1337 (S.D. Cal. 2020) (overruling personal knowledge objection and concluding that Associate Director of Human Resources and Business Unit Head "may testify as to [their] understanding of the [defendant] organization" (citing *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000))).

**Figure 1**
*Source: Towse Decl. at 2*



The abutments used in the LOCATOR® Product Suite, depicted in Figure 2, are gold colored because of a titanium nitride coating.  (*See* Towse Decl. ¶ 6.)

**Figure 2**
*Source: Towse Decl. at 2–3*



According to Zest, this gold coloring "make[s] its abutments easily distinguishable."  (*See* Towse Decl. ¶ 6.)  But because titanium nitride coating "is biocompatible, brightens the gingival hue, is easy to maintain and clean[,] and improves the abutment[']s resistant to scratching[, i]t is common to see gold-colored abutments sold by a variety of brands."  (*See* ECF No. 36-3 ("Morris Decl.") ¶ 9; *see also* ECF No. 36-4 ("Szara Decl.") ¶ 13.)

Further, the top of Zest's LOCATOR® abutments, which receives a torquing tool,[2] uses a trilobate configuration of three notches in the shape of a triangle.  (*See* Towse Decl. ¶ 7; *see also* Stratton Decl. ¶ 13.)  Although "[t]his shape is not unique to Zest[,]" (*see* Morris Decl. ¶ 10), only one of Zest's competitors had imitated this shape before DESS introduced its competing DESSLoc® line.[3]  (*See* Supp. Towse Decl. ¶ 11.)

The retention inserts in the LOCATOR® Product Suite come in "brightly-colored blue, pink, clear, red, orange, and green."  (*See* Stratton Decl. ¶ 6.)  Although "[a]ll dental implant companies that supply overdenture products directly . . . use different colors of inserts to correspond with different retention strengths[,]" (*see* Morris Decl. ¶ 11; *see also* Szara Decl. ¶ 12)—including Zest, (*see* Stratton Decl. ¶¶ 9–10)—Zest believes that its chosen colors also "distinguish [Zest's] product suite" from those of its competitors.  (*See id.* ¶ 7.)  Since 2001, for example, the blue, pink, and clear inserts have been sold as part of Zest's standard retention strength set and correspond to retention strengths of extra light (1.5 lbs), light (3 lbs), and regular (5 lbs), respectively.  (*See id.* ¶ 9; *see also* Towse Decl. ¶ 17.)  Similarly, for eighteen years, Zest has sold bright red, orange, and green inserts as part of its extended retention strength set, which correspond to retention strengths of extra light (1 lbs), light (2 lbs), and regular (4 lbs), respectively.  (*See* Stratton Decl. ¶ 10; *see also* Towse Decl. ¶ 17.)  "[A]side from a handful of market participants who have only recently tried to sell LOCATOR® knock-offs, no Zest competitor has ever used [Zest's] colorful insert scheme or anything close to it."  (Stratton Decl. ¶ 7.)  Further, "there are any number of ways to differentiate inserts, including any combination of differing colors."  (*See* Scherer Decl. ¶ 11.)

/ / /

---

[2] Zest also offers accessories to its LOCATOR® Product Suite, including torquing tools.  (*See* Supp. Towse Decl. ¶ 13.)  According to Zest, these tools are "significantly distinct from the product suite itself" and "are not integral parts of the LOCATOR® Product Suite."  (*See id.*)

[3] Two implant manufacturers also use a similar design, although Zest claims that "the manufacturers for and markets for abutments and implants are significantly different."  (*See* Supp. Towse Decl. ¶ 11.)

Zest IP, an affiliate of Zest, (*see* Compl. ¶ 8), owns unexpired U.S. trademark registrations for these color-coded retention inserts (the "Registered Zest Insert Color Marks"), as depicted in Figure 3.  (*See* Towse Decl. ¶ 9.)

**Figure 3**
*Source: Towse Decl. at 3–4*

| Registration No. | Mark | Date of Registration |
|---|---|---|
| 4,622,637 | | October 14, 2014 |
| 4,622,638 | | October 14, 2014 |
| 4,622,639 | | October 14, 2014 |
| 4,618,874 | | October 7, 2014 |
| 4,618,875 | | October 7, 2014 |
| 4,618,876 | | October 7, 2014 |

Zest also has active U.S. trademark applications for the following combinations, both with and without packaging, as depicted in Figure 4 (the "Zest Insert Combination Marks") (together with the Registered Zest Insert Color Marks, the "Zest Insert Color Marks").  (*See* Towse Decl. ¶ 11.)

5

**Figure 4**
*Source: Towse Decl. at 4*

| Serial No. | Mark | Date Filed |
|---|---|---|
| 90/237,726 | | October 6, 2020 |
| 90/237,737 | | October 6, 2020 |
| 90/237,742 | | October 6, 2020 |
| 90/237,753 | | October 6, 2020 |

"[T]hese applications remain pending, and Zest is in the process of submitting responses to the trademark examiner as necessary to secure registrations." (ECF No. 40-1 ("Supp. Stratton Decl.") ¶ 4.)

Zest claims that the LOCATOR® Product Suite is "the market leader in removable denture attachment products" and "is the most popular and widely used denture attachment system in the world." (*See* Stratton Decl. ¶ 5.) LOCATOR® has won numerous awards and recognitions over the years." (*See id.* ¶¶ 30–31.) Together, Zest's "palette of colorful inserts, . . . and the shape and color of [its] gold abutments [(the "LOCATOR® Trade Dress")] reflect aesthetic choices that serve to define [its] brand." (*See id.* ¶ 13.) "They identify and differentiate LOCATOR® from the rest of the competition," (*id.*), and "are instantly recognizable and synonymous with Zest and LOCATOR®." (*Id.* ¶ 14; *see also id.* ¶ 51; Scherer Decl. ¶ 15.) According to Zest, its "customers, dental professionals, see

6

these design features and understand they are purchasing a time-tested product line that meets Zest's longstanding standards of high quality." (*See* Scherer Decl. ¶ 15.)

"Zest's LOCATOR® customers in the U.S. market are dental professionals, dental laboratories, and others in the dental field." (*See* Stratton ¶ 17.) Zest markets its LOCATOR® Product Suite through various advertising media and promotional activities, including "print advertisements" in dental trade publications; "banner advertisements" on dental trade websites and on various forms of electronic media for dental trade and academy publications; "clinical articles and case reports in dental trade and peer reviewed dental academy publications[;]" "exhibitions" and "advertisements and promotional activities at dental trade meetings[;]" podium presentations at dental trade meetings and regional study clubs[;]" "social media advertisements[;]" "direct mail advertisements[;]" "catalogs and price lists[;]" and its own website. (*See id.* ¶ 16.) These "marketing materials prominently feature [Zest's] trademarked insert colors—blue, pink, clear, red, orange, and green, both individually and in combination—"together with "Zest's uniquely-shaped gold LOCATOR® abutments." (*See id.* ¶¶ 18–21, 24–25.) Over the past decade, Zest has spent an average of $███████ per year marketing LOCATOR®, which represents an average of ███% of its annual revenue. (*See id.* ¶ 23.)

Like its advertising expenditures, Zest's LOCATOR® sales have also been "substantial[,]" (*see id.* ¶ 26), with approximately $███████ per year in annual average revenue from LOCATOR® products since 2012. (*See id.* ¶ 29.) "Zest sells its products through a variety of distribution channels." (Towse Decl. ¶ 19.) One means by which Zest "markets and sells a large portion of its products [is] directly to customers through its website." (*See id.*) The other way in which "Zest sells its products is by contracting with distributors worldwide." (*See id.*) "Currently, Zest sells the LOCATOR® Product Suite through forty independent international distributors and ninety implant manufacturers." (*Id.* ¶ 20.)

As is particularly salient to the instant controversy, between May 1, 2008, and September 2, 2021, "Zest sold a large quantity of Zest LOCATOR® products through

Zimmer Biomet[,]"[4] with Zimmer Biomet purchasing on average approximately $⬛ per month in LOCATOR® products.  (*See* Stratton Decl. ¶ 41.)  "[U]ntil a few years ago, Zimmer Biomet promoted LOCATOR®, including Zest's distinctive inserts and abutments, as part of an 'OverdenSURE' suite of removable attachment products that could be purchased through Zimmer Biomet."  (Towse Decl. ¶ 26.)  As can be seen in Figure 5, for example, Zimmer Biomet's advertisements during the relevant period attributed the products to LOCATOR® and Zest, even when Plaintiffs' products were sold under Zimmer Biomet's OverdenSURE line.  (*See, e.g.*, ECF No. 15-9 ("Pls.' Ex. E") at 318–19, 321–22, 324, 326–27, 329–30, 332–34, 336, 338–40, 345, 349, 351, 353, 356, 359, 363, 365–66.[5])

**Figure 5**
*Source: Pls.' Ex. E at 324, 326, 330*

### OverdenSURE System Solutions

Zimmer Biomet Dental offers a variety of solutions that simplify bar-supported and implant-retained overdenture therapy for clinicians, while providing an improved quality of life for each patient. Options for overdenture therapy include the three most common treatment modalities.

**Bar-Supported Overdentures**

- Removable restoration for easier oral hygiene

**Implant-Supported Overdentures**

- Addresses problems such as limited interocclusal space through the LOCATOR® Abutment's low restorative height

**LOCATOR® Overdenture Implant System (LODI)**

- Narrow diameter implant designed for severely resorbed narrow ridges (<5.0 mm in width)
- Less invasive and more affordable treatment plan
- Easy and intuitive surgical kit and protocol

  

---

[4] On March 1, 2022, Zimmer Biomet spun off its former dental and spine business to a new corporate entity, ZimVie.  *See* Press Release: Zimmer Biomet Announces Completion of ZimVie Spinoff, zimmerbiomet.com, https://investor.zimmerbiomet.com/news-and-events/news/2022/03-01-2022-120035502 (Mar. 1, 2022).  Accordingly, some of the Parties' filings refer to Zimmer Biomet, some to ZimVie, and others to both.  To avoid confusion, the Court will use only the name Zimmer Biomet throughout.

[5] Pin citations to Plaintiffs' and Defendants Exhibits refer to the pagination the Parties have provided in the lower, right-hand corner of each page.

8



**Restorative Components**

- Self-aligning design allows patients to easily place their overdenture
- Various levels of retention and draw correction options are available

LOCATOR Components



**LOCATOR Abutments**

- A stable and tight implant-to-abutment interface
- Dual retention design assists in long-lasting performance of the LOCATOR Abutment and overdenture components
- Allows for the restoration of divergent implants for restorative flexibility

LOCATOR Abutments

Unless otherwise indicated, as referenced herein, all trademarks are the property of Zimmer Biomet; and all products are manufactured by one or more of the dental subsidiaries of Zimmer Biomet Holdings, Inc., and distributed and marketed by Zimmer Biomet Dental (and, in the case of distribution and marketing, its authorized marketing partners). DOLDER is a registered trademark of Professor Eugen Dolder. ZEST and LOCATOR are registered trademarks of Zest IP Holdings, LLC. For additional product information, please refer to the individual product labeling or instructions for use. Product clearance and availability may be limited to certain countries/regions. This material is intended for clinicians only and does not comprise medical advice or recommendations. This material may not be copied or reprinted without the express written consent of Zimmer Biomet Dental. ZB0216 REV A 01 /18 ©2018 Zimmer Biomet. All rights reserved.

Zimmer Biomet uses many of the same marketing channels enumerated above, *see supra* page 7 (citing Stratton Decl. ¶ 16), that Zest uses to market and sell the LOCATOR® Product Suite, (*see* Stratton Decl. ¶ 43), and the U.S. market for Zimmer's Biomet's products is identical to Zest's. (*See id.* ¶ 44.) Zest's distribution agreement with Zimmer Biomet ended on September 2, 2021. (*See id.* ¶ 46.)

## II. Terrats and Its DESSLoc® Products

Terrats' predecessor company was founded in 1947 in Barcelona, Spain, to manufacture precision mechanical components. (*See* ECF Nos. 36-2 (public), 39 (sealed) ("Terrats Decl.") ¶ 7.) In 2004, Terrats began manufacturing dental implant components for other entities, (*see id.*), and Terrats introduced its own dental abutment products under its KOMP brand in 2009. (*See id.* ¶ 8.) Terrats completely discontinued use of the KOMP mark in 2014. (*See id.*)

Between 2011 and 2012, however, Terrats began using the mark DESS Dental Smart Solutions® in Europe. (*See id.*) Terrats intended for its DESS Dental Smart Solutions®

product line to compete with Attachment International, "a specialist in the manufacture of prosthetic parts in the dental implant field." (*See id.* ¶ 9.)  Like Attachment International, Terrats' business model is to "offer a range of abutments compatible to several implant companies." (*See id.* ¶ 30; *see also id.* ¶¶ 9, 22.)

Spanish customers began asking whether Terrats had a product compatible with Zest's LOCATOR® abutment between 2012 and 2013.  (*See id.* ¶ 10.)  Terrats discovered that the company Kerator offered such abutments, as depicted in Figure 6.  (*See id.*)

**Figure 6**
*Source: Opp'n at 8–9*



Terrats therefore purchased Kerator abutments through a Spanish reseller, Futuracam, and offered them in Spain for a few years.  (*See* Terrats Decl. ¶ 10.)

Ultimately, Terrats "decided to create [its] own abutment product to compete with Kerator and other companies offering overdenture abutment products." (*See id.*)  Terrats therefore developed the DESSLoc® abutment in 2015.  (*See id.* ¶ 11.)  Like Zest's LOCATOR® abutments, the DESSLoc® abutments are also gold-colored and have the same triangular-shape on top, as depicted in Figure 7.  (*See* Stratton Decl. ¶ 35.)

**Figure 7**
*Source: Stratton Decl. at 7*

          

**LOCATOR® Abutment**          **DESSLoc Abutment**

10

Unlike the LOCATOR® abutments, however, Terrats' DESSLoc® abutments are made of titanium with a zirconium nitride coating, (*see* Terrats Decl. ¶ 12), which naturally results in a lighter gold color.  (*See id.* ¶ 13; *see also* Szara Decl. ¶ 14.)   Terrats chose to use zirconium nitride, rather than titanium nitride like Zest, because "[t]he zirconium nitride coating improves overall mechanical resistance and reduces gingival inflammation and plaque adhesion."  (*See* Terrats Decl. ¶ 13.)  It is also "even stronger and more scratch resistant" than the titanium nitride coating.  (*See* Szara Decl. ¶ 14.)

Terrats also offers DESSLoc®-branded retention kits, which consist of colored insert caps offered in a color-coded system representing retention strength.  (*See id.* ¶ 14.)  Although there are slight variations in shade, (*see id.* ¶ 15), the DESSLoc® inserts are offered in the same colors, corresponding to same retention strengths, as the LOCATOR® inserts and are also packaged together in same combinations, as depicted in Figure 8.  (*See* Stratton Decl. ¶ 34.)

**Figure 8**
*Source: Stratton Decl. at 7*



**LOCATOR® Inserts**                    **DESSLoc Inserts**

Terrats explains that "[i]t would be cost-prohibitive to indicate the retention strength on the caps given their small size and material[, and] . . . any printed information on the caps would be difficult to read and would eventually be erased by the natural degradation of the material during its normal use." (*See* Terrats Decl. ¶ 14.) When Terrats began manufacturing its own abutments, it therefore decided to offer multi-colored insert caps that also were purchased from Futuracam and sold under the DESSLoc® brand. (*See id.* ¶ 16.) Terrats currently purchases its multi-colored insert caps in the same color range but from another Spanish manufacturer. (*See id.*)

Terrats now sells its DESSLoc® abutment products in more than twenty countries. (*See id.* ¶ 17.) Terrats sells DESSLoc® in the United States through independent distributors, who then sell the products to dentists and dental professionals. (*See id.*) DESS also uses many of the same marketing channels as Zest, (*see* Stratton Decl. ¶ 48), and has an identical U.S. market, (*see id.* ¶ 49), although DESSLoc® customers in the United States cannot purchase the products from Terrats' website, dessdental.com, and "Terrats does not take order for DESSLoc® products at U.S. trade shows." (*See* Terrats Decl. ¶ 23.) Indeed, Terrats "do[es] not ship DESSLoc® to U.S. addresses." (*See id.*)

Terrats first began offering its DESSLoc® products in limited quantities in the United States in 2015. (*See id.* ¶¶ 17–18.) Between 2015 and 2020, Terrats' only independent distributor in the United States was Geryon. (*See id.* ¶ 17.) Now, "DESSLoc® customers can purchase products from Geryon[;] Henry Schein, Inc.[;] and Darby Dental Supply LLC." (*See id.* ¶ 23.) Between 2017 and present, Terrats' "sales of DESSLoc® branded dental abutments and insert caps shipped directly to distributors to their U.S. address[es] . . . have totaled approximately $██████." (*See id.* ¶ 33.) Between 2018 and 2021, this works out to approximately $██████ per year. (*See id.*)

Terrats' "DESSLoc® products have not been modified since being introduced in 2015 in the United States," (*see id.* ¶ 19), and are sold in packaging, which also has not changed since 2015, (*see id.* ¶ 21), that "clearly indicates the source of the goods." (*See id.* ¶ 20.)

### III.   DESS' Alleged Infringement

In the summer of 2017, Zest learned that DESS had begun offering its DESSLoc® products, which Zest considered to be a "knock-off" of its LOCATOR® Product Suite. (*See* Stratton Decl. ¶ 33.)  Zest therefore retained Procopio, Cory, Hargreaves & Savitch LLP ("Procopio") in July 2017, "to protect its intellectual property rights in LOCATOR®, including under trademark law."[6]  (*See id.* ¶ 36.)  "Between July 2017 and October 2020, Zest continued to monitor DESS, and Zest and DESS, through counsel, exchanged a number of letters regarding DESS's [allegedly] infringing products." (*See id.* ¶ 36.)

In 2017, for example, Zest IP contacted DESS Abutments, demanding that Terrats "change [its] materials to delete references to the LOCATOR® mark and discontinue use of the multi-colored insert caps." (*See* Terrats Decl. ¶ 26.) Terrats declined. (*See id.*)  Zest IP again contacted Terrats in 2018, raising similar issues.  (*See id.* ¶ 27.)  In response, Terrats "added 'abutments' after LOCATOR® where that mark appeared in [its] materials." (*See id.*)  Finally, Zest IP contacted Terrats in September 2020, to claim that Terrats was infringing the Zest Insert Color Marks.  (*See id.* ¶ 28.)  Although Terrats did not believe that its products and materials infringed Zest IP's intellectual property, Terrats complied with Zest IP's "request[] that Geryon modify the photos of the multi-colored insert caps on its website to grayscale." (*See id.*; *see also* Stratton Decl. ¶¶ 37–38.)

In late 2021, Zest learned that DESS had partnered with Zimmer Biomet to market in the United States a product identical to DESSLoc® under Zimmer Biomet's OverdenSURE line.  (*See* Stratton Decl. ¶ 47; *see also* Towse Decl. ¶ 24; Terrats Decl. ¶ 25; Szara Decl. ¶ 14.)  "While Zimmer Biomet has begun publicly marketing its OverdenSURE product suite using DESS's . . . products and is taking orders for these products on its website, it is unclear whether Zimmer Biomet has actually begun to ship these products to customers in the United States." (*See* Towse ¶ 29.)

---

[6] Procopio is also counsel of record for Zest's trademark registrations and application.  (*See* Towse Decl. ¶ 13.)

Although some trainings offered by Zimmer Biomet have explicitly communicated that Zimmer Biomet is no longer selling Zest's LOCATOR® products, (*see* Szara Decl. ¶ 16), Zest maintains that Zimmer Biomet's marketing materials may cause confusion, as evidenced by a comparison, shown in Figure 9, of Zimmer Biomet's previous catalogs depicting Zest's LOCATOR® and current catalogs depicting Terrats' DESSLoc® product that is now being offered under Zimmer Biomet's OverdenSURE line.  (*See* Towse Decl. ¶ 28.)

**Figure 9**
*Source: Towse Decl. at 8*





**2020 Zimmer Biomet Brochure Featuring Zest's LOCATOR® Product Suite**

**Current Zimmer Biomet Brochure Featuring The DESSLoc Product Suite**

Not surprisingly, the Parties offer conflicting evidence regarding whether and to what extent these visual similarities risk causing consumer confusion.  On the one hand, one of Terrats' declarants—a licensed dentist with twenty-eight years of practice in prosthodontics, (*see* Morris Decl. ¶¶ 2, 7)—attests that he "do[es] not and could not identify

14

the brand of an insert by the color of the insert," (*see id.* ¶ 11), and Terrats claims that it has "never received an email or any other communication from a customer or from anyone else asking if [its] DESSLoc® products are associated with or authorized by Zest." (*See* Terrats Decl. ¶ 31.)  On the other hand, Zest claims that Terrats' recent partnership with Zimmer Biomet has led to "actual confusion amongst Zest's customers and potential customers." (*See* Scherer Decl. ¶ 21.[7])  "For example, a large Zimmer Biomet customer told [Dr. Scherer] recently that the doctors to whom he sold LOCATOR® are confused by DESS's [alleged] knock-offs and how they related to LOCATOR®." (*See id.* ¶ 22.) "Additionally, an officer manager of a dental office told [Dr. Scherer] she believed that Zimmer Biomet was still selling Zest's products, stating . . . that OverdenSURE, the brand Zimmer Biomet is using to sell DESSLoc[®], was still 'the same LOCATOR® just a new brochure.'" (*See id.* ¶ 23.)

Plaintiffs initiated this action against Defendants on February 18, 2022, asserting six causes of action for (1) trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) trademark infringement and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*; (5) common law trademark infringement; and (6) common law unfair competition. (*See generally* Compl.)  The instant Motion followed on March 7, 2022.  (*See generally* Mot.)

/ / /

---

[7] Defendants also object to paragraphs 21 through 23 of the Scherer Declaration on the grounds that the evidence of actual confusion is inadmissible as "unsubstantiated hearsay" or "hearsay within hearsay[.]" (*See* Opp'n at 24–25.)  For the reasons discussed above, *see supra* note 1, "[i]t [i]s within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction." *Marcos*, 862 F.2d at 1363 (citing *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972)).  Accordingly, the Court also **OVERRULES** Defendants' objection to the Scherer Declaration.

**LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 65(a), a trial judge may grant a preliminary injunction "to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *See Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)). "A preliminary injunction . . . is not a preliminary adjudication on the merits[,] but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Id.* (alteration in original) (quoting *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)). In the context of a preliminary injunction, the status quo "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy[.]'" *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)).

"A party seeking a preliminary injunction must meet one of two variants of the same standard." *Ramos*, 975 F.3d at 887 (quoting *All. for Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

> Under the original standard, plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.

*Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The Ninth Circuit employs an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard." *Id.* (citing *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011)).

> Under this alternate standard, [the court] weigh[s] the preliminary injunction factors on a sliding scale, such that where there are only serious questions going to the merits—that is, less than a likelihood of success on the merits— a preliminary injunction may still issue so long as the balance of hardships tips sharply in the plaintiff's favor and the other two factors are satisfied.

*Id.* at 887–88 (internal quotation marks omitted) (quoting *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018)).  In other words, "[a] preliminary injunction may be granted . . . where the moving party demonstrates either '(1) a combination of probable success on the merits *and* the possibility of irreparable injury *or* (2) the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in [its] favor.'"  *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (emphasis and second alteration in original) (quoting *Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985)).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  Consequently, "[t]he court may issue a preliminary injunction only on notice to the adverse party[,]" *see* Fed. R. Civ. P. 65(a)(1), and "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  *See* Fed. R. Civ. P. 65(c).  "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

Whether to "grant . . . a preliminary injunction is a matter committed to the discretion of the trial judge[,]" and that decision will be "reverse[d] only if that discretion is abused or the decision is based on an erroneous legal standard or clearly erroneous findings of fact."  *See Sierra On-Line*, 739 F.2d at 1421.

## ANALYSIS

Through the instant Motion, Plaintiffs seek a preliminary injunction

to enjoin and restrain until the entry of final judgment in this action Defendants . . . , together with their agents, employees, representatives, and all persons and entities in concert or participation with them from engaging in, committing or performing, directly or indirectly, any and all of the following acts:

17

1. Using in any way, including in connection with the promotion, marketing, advertising, and sale of products or services, Zest's LOCATOR® color retention insert trademarks, Zest's LOCATOR® product suite trade dress, or any trademarks or trade dress that are a colorable imitation thereof, or confusingly similar thereto; and

2. Importing into the United States any products that use the LOCATOR® color retention insert trademarks, the LOCATOR® product suite trade dress, or any trademarks or trade dress that are a colorable imitation thereof, or confusingly similar thereto.

(*See* Mot. at II.)  The Court therefore proceeds to analyze Plaintiffs' showing under the *Winter* factors and then to weigh those factors under the Ninth Circuit's variant standards to determine Plaintiffs' entitlement to preliminary injunctive relief.

## I. Likelihood of Success on the Merits

Plaintiffs contend that they are entitled to preliminary injunctive relief because they are likely to succeed on their claims that Defendants' DESSLoc® products infringe both (1) the Zest Insert Color Marks, (*see* Compl. ¶¶ 78–98, 116–24), which comprise the Registered Zest Insert Color Marks for each of the LOCATOR® colored inserts, together with what the Court has termed the Zest Insert Combination Marks, which are "combinations of the Registered Zest Insert Color Marks, appearing both with and without packaging," that are sold in Plaintiffs' standard and extended retention strength sets, (*see id.* ¶¶ 34–35); and (2) the LOCATOR® Trade Dress, (*see id.* ¶¶ 99–109), which is defined by the "characteristic LOCATOR® insert colors and distinctively-shaped gold LOCATOR® abutments," (*see, e.g., id.* ¶ 20).  (*See generally* Mot. at 14–28.)  Because it is undisputed that neither the Zest Insert Color Marks nor the LOCATOR® Trade Dress are registered on the United States Patent and Trademark Office's ("PTO") Principal Register, (*see* Reply at 8–9), the analysis for both Plaintiff's trademark and trade dress infringement claims "is very similar."  *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992); *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987)).

/ / /

"Under either theory[, Plaintiffs] must show the [Zest Insert Color Marks and LOCATOR® Trade Dress are]: (1) nonfunctional; (2) either inherently distinctive or ha[ve] acquired a secondary meaning; and (3) likely to be confused with [Defendants' DESSLoc®] products by members of the consuming public." *See id.* (citing *Two Pesos*, 505 U.S. at 769–70; *HWE Inc. v. JB Research, Inc.*, 993 F.2d 694, 696 (9th Cir. 1993); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987)); *see also adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018) (quoting *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009)).  Defendants challenge Plaintiffs' showing as to each of these requirements.[8] (*See* Opp'n at 12–27.)

### *A.    Functionality*

"Trademark or trade dress protection extends only to product features that are nonfunctional." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998).   Like the Supreme Court, the Ninth Circuit recognizes two types of functionality, "each with its own legal test." *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 865 (9th Cir. 2020) (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32–33 (2001)), *cert. denied*, 141 S. Ct. 1514 (2021).  "The two types are 'utilitarian functionality,' which is based on how well the product works, and 'aesthetic functionality,' which is based on how good the product looks." *Id.* (citing *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067, 1073–74 (9th Cir. 2006)).  "If the claimed trade dress has either type of functionality, it is unprotectable." *Id.* (citing *Au-Tomotive Gold*, 457 F.3d at 1072).

Accordingly, "the test for functionality proceeds in two steps." *Millennium Lab'ys, Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1128 (9th Cir. 2016) (quoting *Au-Tomotive Gold*,

---

[8] Defendants do not contest that Plaintiffs, who have used the Zest Insert Color Marks and LOCATOR® Trade Dress in commerce for approximately twenty years, (*see, e.g.*, Stratton Decl. ¶¶ 9–10; Towse Decl. ¶ 17), have priority of use over DESSLoc®, which first began offering its colored inserts in 2015, (*see, e.g.*, Terrats Decl. ¶¶ 11, 14, 16–18). *See, e.g.*, *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012) ("It is axiomatic in trademark law that the standard test of ownership is priority of use." (quoting *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996))).

457 F.3d at 1072).  First, the court assesses whether the claimed trade dress has utilitarian functionality, meaning "it is essential to the use or purpose of a product or affects its cost or quality." *Blumenthal*, 963 F.3d at 865 (citing *Millennium*, 817 F.3d at 1127–28 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982))).  "If the claimed trade dress is determined to be functional under Step One, then 'the inquiry is over.'" *Millennium*, 817 F.3d at 1129 (quoting *Au-Tomotive Gold*, 457 F.3d at 1072).  "If not, the court must proceed to the second step and address aesthetic functionality." *Id.*

Where, as here, a plaintiff "define[s] its claimed trade dress as the 'overall appearance' of its product[,] . . . these tests must be applied with extra care to prevent 'semantic trickery' from obscuring the functionality of the design the plaintiff seeks to monopolize." *See Blumenthal*, 963 F.3d at 865–66 (footnote omitted).  Consequently, the Ninth Circuit has "held that the proper standard for whether a claimed trade dress consisting of an 'overall appearance' is functional is whether 'protecting the trade dress threatens to eliminate a substantial swath of competitive alternatives in the relevant market.'" *Id.* at 866 (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1261 n.5 (9th Cir. 2001)).

### 1.    Utilitarian Functionality

To determine whether a claimed trade dress has utilitarian functionality, courts "use the four-factor test from *Disc Golf*." *See Blumenthal*, 963 F.3d at 865 (citing *Millennium*, 817 F.3d at 1129).  "The *Disc Golf* factors are: '(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture.'" *Id.* (quoting *Millennium*, 817 F.3d at 1128 (quoting *Disc Golf*, 158 F.3d at 1006)).  "No one factor is dispositive; all should be weighed collectively." *Id.* (quoting *Millennium*, 817 F.3d at 1130 (quoting *Disc Golf*, 158 F.3d at 1006)).

Here, Plaintiffs claim a valid, protectable interest in both the Zest Insert Color Marks and the LOCATOR® Trade Dress.  The Court therefore analyzes each separately.

a.    Zest Insert Color Marks

The Zest Insert Color Marks are themselves comprised of both the Registered Zest Insert Color Marks and Zest Insert Combination Marks.  (*See* Compl. ¶¶ 34–35.)  Plaintiffs contend that their "primary purpose . . . is to distinguish Zest's inserts aesthetically from competing brands' inserts," (*see* Mot. at 17 (citing Stratton Decl. ¶ 7)), while Defendants counter that "[t]he Asserted Zest IP insert colors are purely functional: they indicate retention strength."  (*See* Opp'n at 13.)

Upon consideration of the claimed marks under the *Disc Golf* factors, the Court concludes that the Zest Insert Color Marks have utilitarian functionality.  Regarding the first factor, as Plaintiffs themselves acknowledge, the Zest Insert Color Marks do yield a utilitarian advantage, *i.e.*, "indicat[ing] . . . retention strength."  (*See* Mot. at 17.)  Indeed, the record before the Court indicates that it is industry standard to use different colors to convey retention strength, (*see* Morris Decl. ¶ 11; Szara Decl. ¶ 12), in part because there are no plausible alternatives.  (*See* Terrats Decl. ¶ 14.)

As for the second factor, Plaintiffs contend that they "do[] not claim rights in *all* insert colors or color-coding of inserts as a concept," (*see* Reply at 4), and that "there are numerous alternative colors . . . that competitors could (and do) use to indicate varying retention strengths."  (*See* Mot. at 18 (emphasis in original) (citing Towse Decl. ¶ 18; Stratton Decl. ¶ 15; ECF No. 15-5 ("Pls.' Ex. A")).)  The Registered Zest Insert Color Marks, however, consist of six distinct marks, each asserting rights over a separate color divorced from retention strength.  (*See* ECF No. 15-10 ("Pls.' Ex. F").)  If the Court were to conclude that Plaintiffs have a valid and protectable interest in each of the Registered Zest Insert Color Marks, Plaintiffs could foreclose their competitors from using many alternative insert designs that include the colors blue, pink, clear, red, orange, and green.[9]

---

[9] Indeed, many of Plaintiffs' competitors are already using at least one of these colors for their inserts. (*See, e.g.*, Pls.' Ex. A at 6–10 (Rhein83 OT Equator: pink, clear, red), 17 (Straumann Novaloc: green), 19–20 (BioHorizons OD Secure: pink, clear).)

*See, e.g.*, *First Brands*, 809 F.2d at 1382–83 (affirming district court's denial of preliminary injunction involving yellow, one-gallon, F-style jugs because, "if [the plaintiff] were granted protection of its . . . trade dress, it would in effect be getting a trademark on the color yellow as a background color for an ordinary-shaped container . . . [, which] would deplete a primary color available to competitors and deprive them of a competitive need").

Similarly, the Zest Insert Combination Marks seek protection for "[t]he color(s) clear, pink and blue," (*see* ECF No. 15-11 ("Pls.' Ex. G") at 382, 395), and "[t]he color(s) red, green and orange," (*see id.* at 408, 419), both without any packaging, (*see id.* at 387, 413, and inside an unmarked, clear plastic tube. (*See id.* at 400, 424.)  As with the Registered Zest Insert Color Marks, protection of the Zest Insert Combination Marks could foreclose Plaintiffs' competitors from offering any combination of clear, pink, and blue and red, green, and orange inserts, despite the associated retention strengths.  In other words, even though Plaintiffs "do[] not claim rights in *all* insert colors," (*see* Reply at 4 (emphasis in original)), a large number of alternative designs would be foreclosed if Plaintiffs were allowed to exert rights over the Zest Insert Color Marks.

Third, while Plaintiffs' advertising may not "tout" the utilitarian advantages of the Zest Insert Color Marks, the colors (and corresponding retention strengths) have been— and currently are—prominently depicted in Plaintiffs' promotional materials over the last decade.  (*See, e.g.*, ECF No. 15-6 ("Pls.' Ex. B") at 44–45, 48, 50, 56, 59, 98, 101, 108, 110, 112, 127, 129, 155, 161.)  In any event, the utilitarian advantages of the Zest Insert Color Marks are likely apparent to Plaintiffs' customer base given that the use of color to differentiate among retention strengths is the industry standard.  (*See* Morris Decl. ¶ 11; Szara Decl. ¶ 12.)

Finally, there is no indication that the Zest Insert Color Marks are any more simple or inexpensive to manufacture than any other inserts.  Although this final factor therefore would appear to be neutral, the remaining factors weigh in favor of concluding that the Zest Insert Color Marks have utilitarian functionality.  Accordingly, the Court concludes

/ / /

that Plaintiffs fail to establish a likelihood of succeeding on the merits of their trademark infringement claims based on the Zest Insert Color Marks.

b.    LOCATOR® Trade Dress

By comparison to the Zest Insert Color Marks, the LOCATOR® Trade Dress incorporates a variety of elements—insert colors combined with a trilobe-topped, gold abutment.  Defendants contend that, "[b]ecause *each* component of the Asserted Zest IP has both utilitarian and aesthetic functionality, Zest has failed to make a 'clear showing' of a likelihood of success on proving the non-functionality of the Asserted Zest IP."[10]  (*See* Opp'n at 13 (emphasis in original).)

The Ninth Circuit has concluded that Defendants' "argument—that the [abutments]' overall appearances are functional 'because they *include*, in whole or *in part*, elements that are functional' . . . —is a nonstarter."  *See Blumenthal*, 963 F.3d at 867 (emphasis in original).  This is because, as Plaintiffs point out, (*see* Reply at 4 (citing *Clicks Billiards*, 251 F.3d at 1259)), the LOCATOR® Product Suite must be examined "as a whole."  *See Blumenthal*, 963 F.3d at 866.  "[T]o examine a product 'as a whole' is to examine all of its features, including the ways in which its various parts are combined or arranged, and to recognize that nonfunctional combinations or arrangements of functional parts can create an overall appearance that should be deemed nonfunctional."  *See id.* (citing *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011 n.3, 1013 (9th Cir. 1999)).

While it is clear that the LOCATOR® inserts and abutments each serve a functional purpose, "[t]he fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress *as a whole* is functional; rather, 'functional elements that are separately unprotectable can be protected together as part of a trade dress.'"  *See Clicks Billiards*, 251 F.3d at 1259 (emphasis in original) (quoting *Fuddruckers, Inc. v.*

---

[10] For purposes of their Opposition, Defendants define "Asserted Zest IP" to mean (1) each individual color of its color-coded insert caps; (2) the gold abutment color, and (3) the triangular-shaped abutment."  (*See* Opp'n at 2.)

*Doc's B.R. Others, Inc.*, 826 F.2d 837, 842 (9th Cir. 1987)).  Here, Plaintiffs introduce evidence that the overall appearance of the LOCATOR® Product Suite "derive[s] from non-utilitarian design choices," *see, e.g.*, *Blumenthal*, 963 F.3d at 867, such as the specific colors it has selected to differentiate between inserts with different retention strengths, (*see* Stratton Decl. ¶¶ 7–10; Towse Decl. ¶¶ 9–12, 18); the specific shape where the abutment top receives a torquing tool, (*see* Stratton Decl. ¶ 12; Towse Decl. ¶¶ 7–8); and the gold abutment color resulting from its selection of a titanium nitride coating.  (*See* Towse Decl. ¶ 6.)  There is no evidence that the combination of these design choices would confer any utilitarian advantage over Plaintiffs' competitors.

Further, unlike the Zest Insert Color Marks, *see supra* Section I.A.1.a, protecting the LOCATOR® Trade Dress would not "threaten[] to eliminate a substantial swath of competitive alternatives in the relevant market."  *See Blumenthal*, 963 F.3d at 866 (quoting *Clicks Billiards*, 251 F.3d at 1261 n.5).  As Defendants' own evidence reveals, there are many alternate insert color combinations, (*see, e.g.*, ECF No. 36-30 ("Defs.' Ex. U")), and, as Defendants' own website demonstrates, there is a wide array of shapes used on the top of abutments.  (*See, e.g.*, ECF No. 15-21 ("Pls.' Ex. Q") at 504.)  Further, while many of Plaintiffs' competitors use a titanium nitride coating, (*see* Morris Decl. ¶ 9; Szara Decl. ¶ 13), resulting in a gold-colored abutment,[11] (*see* Towse Decl. ¶ 6), others do not.  (*E.g.*, Pls.' Ex. A at 2, 12–13 (Straumann Novaloc's black, "carbon-based coating"); Defs.' Ex. U at 537 (Meg-Loc's silver, titanium abutment), 538 (Optiloc's silver, titanium abutment).)

Given the lack of evidence that Plaintiffs tout the utilitarian purposes of the LOCATOR® Product Suite's combined specific design choices or that those choices in combination are comparatively simple or inexpensive to manufacture,[12] the Court

---

[11] Indeed, while DESSLoc® also offers a gold-colored abutment, it is naturally a lighter gold color because Defendants use a different, zirconium nitride coating.  (*See* Terrats Decl. ¶¶ 12–13; Szara Decl. ¶ 14.)

[12] While Defendants have introduced evidence that DESSLoc®'s zirconium nitride coating is more expensive than LOCATOR®'s titanium nitride coating as a result of licensing fees, (*see* Terrats Decl. ¶ 13), it is clear that Defendants elected a more expensive coating because it confers certain perceived

24

concludes that the LOCATOR® Trade Dress does not have utilitarian functionality and proceeds to step two of the functionality analysis.

### 2.    *Aesthetic Functionality*

Under the second step of the functionality analysis, "[a] claimed trade dress has aesthetic functionality if it serves 'an aesthetic purpose wholly independent of any source identifying function,' such that the trade dress's protection under trademark law 'would impose a significant non-reputation-related competitive disadvantage' on its owner's competitors." *Blumenthal*, 963 F.3d at 865 (quoting *Millennium*, 817 F.3d at 1129, 1131).

> [T]he inquiry is whether, if one seller were given exclusive rights to use the claimed trade dress, other sellers would be forced to use alternative designs that make their products more costly to sell, or for which consumers' willingness to pay would be lower for reasons having nothing to do with the reputation of any source (e.g., the alternative designs would not have as much intrinsic aesthetic appeal).

*Id.* "If such competitive disadvantages would be significant, then this second requirement for aesthetic functionality is satisfied." *Id.*

As discussed above, *see supra* Section I.A.1.b, there are a wide array of available insert colors, shapes to accept torquing tools, and coatings—and an even greater combination of those elements—available to other manufacturers of abutments. Consequently, neither Defendants nor any of Plaintiffs' other competitors would "be at a non-reputation-related competitive disadvantage" if they were disallowed from using the same combination of those elements Plaintiffs have selected for the LOCATOR® Trade Dress. (*Cf.* Opp'n at 14 ("DESS would . . . be at a non-reputation-related competitive disadvantage if it could not color code its inserts."), 15 ("DESS would again be at a non-

---

advantages, such as "improv[ing] overall mechanical resistance and reduc[ing] gingival inflammation and plaque adhesion," (*see id.*), and superior strength and scratch resistance. (*See* Szara Decl. ¶ 14.) In any event, recognizing a protectable interest in Plaintiffs' LOCATOR® Trade Dress would not foreclose its competitors from using titanium nitride; rather, it would only foreclose its competitors from using a titanium nitride coating *in combination with* the same insert colors and same shaped abutment that comprise the LOCATOR® Trade Dress.

reputation-related competitive disadvantage if it could not use its own licensed and distinctively different coating and associated gold color.").)

Further, Plaintiffs have introduced evidence that the LOCATOR® Trade Dress does not serve "an aesthetic purpose wholly independent of any source identifying function." For example, Zest's President and Chief Executive Officer attests that the LOCATOR® Product Suite's "palette of colorful inserts, which has never changed, and the shape and color of [its] gold abutments reflect aesthetic choices that serve to define [Plaintiffs'] brand." (*See* Stratton Decl. ¶ 13; *see also id.* ¶ 7 ("When we launched LOCATOR® decades ago, we chose [blue, pink, clear, red, orange, and green inserts] to distinguish our product suite.").) On the other hand, there is no evidence that the LOCATOR® Trade Dress has more intrinsic, aesthetic appeal than the combinations employed by its competitors. (*See* Mot. at 19 ("[D]ental professionals do not purchase products bearing . . . the LOCATOR® Trade Dress because of their 'intrinsic' aesthetic appeal. . . . They purchase the LOCATOR® Product Suite because of its high quality and durability, not [because it is a] beautiful product." (citation and quotation marks omitted; fourth alteration in original)).)

Accordingly, the Court concludes that the LOCATOR® Trade Dress does not have aesthetic functionality. *See, e.g.*, *Millennium*, 817 F.3d at 1131 (denying the defendant's motion for summary judgment as to aesthetic functionality where the plaintiff "presented evidence that the [claimed trade dress] served in part a source-identifying function").

### 3. Conclusion

Because the Court concludes that the *Zest Insert Color Marks* have utilitarian functionality, *see supra* Section I.A.1.a, the Court necessarily concludes that Plaintiffs cannot establish a serious question going to, much less a likelihood of success on, the merits as to their trademark infringement claim. But because the Court concludes that the LOCATOR® Trade Dress has neither utilitarian nor aesthetic functionality, *see supra* Sections I.A.1.b, I.A.2, respectively, the Court therefore concludes that Plaintiffs have / / /

carried their burden of demonstrating that the LOCATOR® Trade Dress is non-functional and proceeds to the next step of its analysis.

### B. Secondary Meaning

"A trade dress has acquired secondary meaning when consumers associate the design features with a particular producer." *adidas*, 890 F.3d at 754 (citing *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011)). In other words, "a plaintiff must demonstrate 'a mental recognition in buyers' and potential buyers' minds that products connected with the [mark] are associated with the same source.'" *See Art Attacks*, 581 F.3d at 1145 (alteration in original) (quoting *Japan Telecom v. Japan Telecom Am.*, 287 F.3d 866, 873 (9th Cir. 2002)).

"A plaintiff may establish secondary meaning through direct and circumstantial evidence." *Cont'l Lab'y Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 999–1000 (S.D. Cal. 2000) (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:30 (4th ed. 2000) ("McCarthy")). "Direct evidence, such as consumer surveys and direct consumer testimony, often provides the strongest evidence of secondary meaning."[13] *Id.* at 1000 (first citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985); then citing *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989)). "A plaintiff may also establish secondary meaning through circumstantial evidence, such as: exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market." *Id.* (citing *Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999); *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir. 1989)); *accord adidas*, 890 F.3d at 754 ("Some of the relevant factors for determining secondary meaning include the exclusivity, manner, and length of use of the trade dress,

---

[13] Defendants fault Plaintiffs for not introducing such direct evidence. (*See* Opp'n at 18.) But "survey evidence is only one of the most persuasive ways to prove secondary meaning, and not a requirement for such proof," *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996), particularly at the preliminary injunction phase.

the amount and manner of advertising, the amount of sales, and proof of intentional copying by the defendant." (citing *Art Attacks*, 581 F.3d at 1145)).  "Evidence of deliberate copying may, in appropriate cases, support an inference of secondary meaning."  *Cont'l Lab'y*, 114 F. Supp. 2d at 1000 (citing *Fuddruckers, Inc.*, 826 F.2d at 844).

Here, Plaintiffs contend that the LOCATOR® Trade Dress has acquired secondary meaning because of its long, exclusive use; Plaintiffs' substantial advertising efforts; and Defendants' exact copying.  (*See* Mot. at 20–21.)  Separately addressing the LOCATOR® insert colors and abutment shape, Defendants counter that Plaintiffs have failed to carry their burden.  (*See* Opp'n at 16–20.)  Again, Defendants miss the mark by failing to address the LOCATOR® Trade Dress as a whole.[14]  *See supra* Section I.A.2.  Nonetheless, because Plaintiffs bear the burden of establishing their entitlement to preliminary injunctive relief, the Court must assure itself that Plaintiffs adequately have demonstrated that the LOCATOR® Trade Dress has acquired secondary meaning based on the record before it.

First, Plaintiffs have introduced evidence that they first began continuously and exclusively using the LOCATOR® Trade Dress in 1999.  (*See* Towse Decl. ¶ 14.) Plaintiffs therefore enjoyed continuous and exclusive use for approximately sixteen years before DESSLoc® entered the United States market in 2015.  (*See* Terrats Decl. ¶ 19.) Although this is but one factor in the analysis, *see, e.g.*, *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1180 (N.D. Cal. 2007) (citing McCarthy § 15:53), the Ninth Circuit has suggested that nine years is "a fairly long time" and that "[f]ive years of exclusive use is prima facie evidence of secondary meaning."[15]  *Cal. Scents v. Surco Prod., Inc.*, 28 F. App'x 659, 663 (9th Cir. 2002) (citing 15 U.S.C. § 1052(f)).

---

[14] Defendants, for example, argue that the PTO's 2014 denial of Plaintiffs' applications to have the Registered Zest Insert Color Marks placed on the Principal Register are "dispositive" of the secondary meaning issue.  (*See* Opp'n at 17–18.)  Even if this were true, (*cf.* Reply at 8–10), the PTO examined *only* the Registered Zest Insert Color Marks, not the LOCATOR® Trade Dress.

[15] *California Scents* is unpublished, *see* 9th Cir. Rule 36-3, and there appears to be a split in authority as to whether five years of exclusive use in commerce establishes a prima facie case of secondary meaning.

Plaintiffs also introduce evidence that they have expended significant amounts of money over the years on advertisements depicting the LOCATOR® Trade Dress.  (*See, e.g.*, Stratton Decl. ¶¶ 18–20 (depicting advertisements displaying the LOCATOR® trade dress (citing Pls.' Ex. B at 44–45, 56, 108)), ¶ 23 (noting that Plaintiffs have spent approximately $███████ per year marketing LOCATOR®, which represents approximately ██% of its annual revenue).)  Of course, "[a] large expenditure of money does not in itself create legally protectable rights[ because] . . . [t]he test of secondary meaning is the effectiveness of the effort to create it." *See First Brands*, 809 F.2d at 1383 (first alteration in original) (internal quotation marks omitted) (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800, 802 (9th Cir. 1970)).  Here, however, Plaintiffs' advertising has resulted in it becoming an award-winning, "market leader in removable denture attachment products," that now "is the most popular and widely used denture attachment system in the world."  (*See* Stratton Decl. ¶¶ 5, 30–31.)  Further, although "[s]econdary meaning and likelihood of buyer confusion are separate but related determinations," *see adidas*, 890 F.3d at 754 (quoting *Levi Strauss Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir. 1980)), Plaintiffs' "evidence of the history of marketing their product and that at least one consumer was indeed confused by the similarity" of DESSLoc® to the LOCATOR® Trade Dress, (*see* Scherer Decl. ¶¶ 21–23), supports an inference of secondary meaning.  *See Am. Rena Int'l Corp v. Sis-Joyce Int'l Co.*, No. CV-12-06972-DMG-JEMX, 2012 WL 12538385, at *7 (C.D. Cal. Oct. 15, 2012), *aff'd*, 534 F. App'x 633 (9th Cir. 2013).

---

*Compare CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1079 (E.D. Cal.) ("Prima facie evidence of the development of secondary meaning is established where a mark has been continuously and exclusively used for a period of five years." (citing *Secular Org. for Sobriety Inc. v. Ullrich*, 213 F.3d 1125, 1130 (9th Cir. 2000)), *aff'd*, 348 F. App'x 288 (9th Cir. 2009), *with Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1116 (N.D. Cal. 2010) ("Neither party discusses the threshold question of whether section 2(f) is germane in a[ trademark] infringement case where the mark is *unregistered*.  Stated simply, it is not." (emphasis in original)).  In any event, Plaintiffs used the LOCATOR® Trade Dress exclusively in commerce for sixteen years—providing a substantial window for the LOCATOR Trade Dress to assume secondary meaning—before DESSLoc® entered the market.

Finally, "[p]roof of copying strongly supports an inference of secondary meaning." *adidas*, 890 F.3d at 755 (alteration in original) (quoting *Vision Sports*, 888 F.2d at 615). Defendants contend that they initially bought the DESSLoc® abutments and inserts through another company, Futuracam, (*see* Terrats Decl. ¶¶ 10, 16), but this was spurred by inquiries from Defendants' Spanish customers as to whether they "had a product *compatible with Zest's LOCATOR® abutment*." (*See id.* ¶ 10 (emphasis added).)  In any event, "[t]he similarities between the [LOCATOR® Trade Dress] and [DESSLoc®] are unmistakable."  *See adidas*, 890 F.3d at 755.  Defendants point out slight variations in shade between the inserts, (*see* Szara Decl. ¶ 15), and the lighter gold color of their abutments.  (*See* Terrats Decl. ¶ 13; Szara Decl. ¶ 14.)  But these "[m]inor differences . . . do not negate the overall impression of similarity," *see adidas*, 890 F.3d at 755 (citing *Clicks Billiards*, 251 F.3d at 1259), and the corresponding inference of direct copying.  As Plaintiffs note, "[t]here is no logical reason for [Defendants'] precise copying save an attempt to realize upon a secondary meaning that is in existence." (*See* Mot. at 20 (second alteration in original) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985)).)

Accordingly, the Court concludes that Plaintiffs' have established that the LOCATOR® Trade Dress has acquired secondary meaning.  *See, e.g.*, *Vision Sports*, 888 F.2d at 615 (affirming district court's conclusion that "logo ha[d] acquired secondary meaning . . . based on [the plaintiff]'s extensive use and promotion of the logo and also on [the defendant]'s deliberate and close imitation of the design").

### C.   Likelihood of Confusion

The final factor—likelihood of confusion—"turns on whether a reasonably prudent consumer would be confused about the source of the goods bearing the marks."  *See adidas*, 890 F.3d at 755 (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)).  "Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context[, which] . . . are ///

30

commonly referred to as the '*Sleekcraft* factors.'"  *Id.* (quoting *Vision Sports*, 888 F.2d at 616).  Pursuant to *Sleekcraft*,

> In determining whether confusion between related goods is likely, the following factors are relevant:
>
> 1.  strength of the mark;
>
> 2.  proximity of the goods;
>
> 3.  similarity of the marks;
>
> 4.  evidence of actual confusion;
>
> 5.  marketing channels used;
>
> 6.  type of goods and the degree of care likely to be exercised by the purchaser;
>
> 7.  defendant's intent in selecting the mark; and
>
> 8.  likelihood of expansion of the product lines.

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) (footnote omitted) (citing *Sleeper Lounge Co. v. Bell Mfg. Co.*, 253 F.2d 720, 722 (9th Cir. 1958)); Restatement (First) of Torts § 731 (1938)), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003).   "[O]nly a subset of the *Sleekcraft* factors are needed to reach a conclusion as to whether there is a likelihood of confusion."  *adidas*, 890 F.3d at 756 (quoting *GoTo.com*, 202 F.3d at 1206).

As an initial matter, "the similarity of the marks[ ]has always been considered a critical question in the likelihood-of-confusion analysis."  *See GoTo.com*, 202 F.3d at 1205 (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)).  "Together with the relatedness of the services and the use of a common marketing channel, this . . . factor constitutes part of the controlling troika in the *Sleekcraft* analysis."  *See id.*  Unfortunately for Defendants, they do not contest any of these "controlling" factors.  (*See generally* Opp'n at 21–27; *see also* Reply at 9.)  Nor could they—both

LOCATOR® and DESSLoc® are denture attachment product suites, both use the same insert colors to correspond to the same retention strength and the same trilobe shape on the top of a gold-colored abutment,[16] and both use nearly identical marketing channels.[17]

This leaves only four *Sleekcraft* factors in dispute: (1) the strength of the LOCATOR® Trade Dress, (2) the degree of care likely to be exercised by the Parties' clientele, (3) evidence of actual confusion, and (4) Defendants' intent in designing its DESSLoc® line.[18]  As for the first of these, "in situations in which the appearance of the conflicting marks and the services provided are almost identical, 'the strength of the mark is of diminished importance in the likelihood of confusion analysis.'"  *GoTo.com*, 202 F.3d at 1208 (quoting *Brookfield*, 174 F.3d at 1059).  As discussed above, *see supra* page 30, Defendants have conceded the near identity in the appearance and goods provided.  In any event, even assuming that the LOCATOR Trade Dress is weak, the Court has concluded that Plaintiffs have established that it is has acquired secondary meaning, *see supra* Section I.B, thereby rendering it distinctive.  *See, e.g.*, *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1158 (C.D. Cal. 2009) ("The distinctiveness of trade dress is related to the

---

[16] As noted above, *see supra* Section I.B, Defendants do identify minor distinctions between the LOCATOR® and DESSLoc® lines, such as slight variations in shade between the inserts, (*see* Szara Decl. ¶ 15), and the lighter gold color of their abutments.  (*See* Terrats Decl. ¶ 13; Szara Decl. ¶ 14.) Figures 7 and 8, however, reveal the striking similarity between the LOCATOR® and DESSLoc® abutments and inserts, respectively.  *See supra* pages 10–11.  Further, not only do the products look alike, but they also have similar sounding names—ZestLoc (as a potential shorthand for Zest LOCATOR®) sounds nearly identical to DESSLoc®.

[17] Between May 1, 2008, and September 2, 2021, Plaintiffs partnered with Zimmer Biomet to sell LOCATOR® products under Zimmer Biomet's OverdenSURE line.  (*See* Towse Decl. ¶ 26.)  In late 2021, after Plaintiffs' partnership with Zimmer Biomet ended, Defendants partnered with Zimmer Biomet to market in the United States a product identical to DESSLoc® under Zimmer Biomet's OverdenSURE line.  (*See* Stratton Decl. ¶ 47; *see also* Towse Decl. ¶ 24; Terrats Decl. ¶ 25; Szara Decl. ¶ 14.)  Zimmer Biomet aside, there is not dispute that both Plaintiffs and Defendants use a number of the same marketing channels.  (*See, e.g.*, Stratton Decl. ¶ 48.)

[18] Plaintiffs correctly note that the eighth factor—likelihood of expansion of product lines—is "not implicated" here, (*see* Reply at 10 n.3 (citing Mot. at 28)), because "DESS and Zest compete directly." (*See* Mot. at 28 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011)).)

question of secondary meaning." (citing *TrafFix Devices*, 532 U.S. at 28)).  There is also evidence in the record that dental professionals associate the LOCATOR® Trade Dress with Plaintiffs.[19]  (*See, e.g.*, Scherer Decl. ¶ 15 ("As a practicing dentist and prosthodontist, and in my work speaking with dentists and others in the dental field, I have found that dental professionals automatically associate LOCATOR®'s distinctive aesthetic features—the brightly-colored inserts and the distinctive abutments—with Zest."), ¶¶ 21–23 (discussing customer confusion).)  This factor therefore favors Plaintiffs.

As for degree of consumer care, "[c]onfusion is less likely where buyers exercise care and precision in their purchases, such as for expensive or sophisticated items.  In evaluating this factor, [courts are to] consider 'the typical buyer exercising ordinary caution.'"  *See Au-Tomotive Gold*, 457 F.3d at 1076 (citing *Sleekcraft*, 599 F.2d at 353).  Here, it is undisputed that buyers of the Parties' products are dental professionals, (*see* Stratton Decl. ¶ 17; Towse Decl. ¶ 19; Terrats Decl. ¶ 24; Morris Decl. ¶¶ 2, 7, 13), who "are sophisticated consumers who will exercise heightened care."  *See Juno Therapeutics, Inc. v. Juno Biomed., Inc.*, No. 17-CV-04196-JSC, 2018 WL 2021483, at *6 (N.D. Cal. Mar. 26, 2018) (citing *Vertos Med., Inc. v. Globus Med., Inc.*, No. C 09-1411 PJH, 2009 WL 3740709, at *8–9 (N.D. Cal. Nov. 6, 2009); *Asuragen, Inc. v. Accuragen, Inc.*, Case No. 16-cv-05440-RS, 2018 WL 558888, at *3 (N.D. Cal. Jan. 25)), *report and recommendation adopted*, No. 2018 WL 1993407 (N.D. Cal. Apr. 27, 2018).  A "higher standard," however, "will not preclude a finding that confusion is likely."  *See Sleekcraft*, 599 F.2d at 353 (citing *Am. Drill Brushing Co. v. Rockwell Mfg. Co.*, 342 F.2d 1019, 1022 (C.C.P.A. 1965)).

/ / /

---

[19] Defendants attempt to rebut this evidence through the Morris and Szara Declarations.  Like the rest of Defendants' briefing, however, each of those declarations fails to address the LOCATOR® Trade Dress as a whole, instead focusing only on its individual elements (the individual insert colors, the gold-colored abutment, and the trilobe abutment top).  (*See* Morris Decl. ¶¶ 9–11; Szara Decl. ¶¶ 10–13.)  The relevance of this testimony is therefore minimal at best.

Such is the case here—although dental professionals are sophisticated, Defendants' product is now being marketed through Zimmer Biomet under its OverdenSURE line, as Plaintiffs' nearly identical product was until recently.  As Plaintiffs demonstrate with respect to the next *Sleekcraft* factor, this could lead to confusion among even the most sophisticated of buyers.  *See, e.g.*, *Am. Rena*, 2012 WL 12538385, at *6 ("Where, as here, the parties' marks are nearly identical, it 'is irrational to expect that even the most sophisticated consumer will exercise the kind of scrupulous examination that would enable him or her to discern the difference' between the two product lines." (quoting *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001))).  Accordingly, the Court finds that this factor also favors Plaintiffs.

This brings us to actual confusion.  Especially at the preliminary injunction stage, "[f]ailing 'to prove instances of actual confusion is not dispositive against a trademark plaintiff' because 'difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.'"  *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1131 (9th Cir. 2014) (quoting *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007)) (citing *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014)).  Nonetheless, Plaintiffs introduce some evidence of actual confusion here.  (*See* Scherer Decl. ¶¶ 21–23.)  "For example, a large Zimmer Biomet customer told [Dr. Scherer] recently that the doctors to whom he sold LOCATOR® are confused by DESS's knock-offs and how they relate to LOCATOR®." (*Id.* ¶ 22.)  "Additionally, an office manager of a dental office told [Dr. Scherer] she believed that Zimmer Biomet was still selling Zest's products, stating to [Dr. Scherer] that OverdenSURE, the brand Zimmer Biomet is using to sell DESSLoc, was still 'the same LOCATOR® just a new brochure.'" (*Id.* ¶ 23.)  This factor therefore weighs in favor of Plaintiffs.  *See, e.g.*, *Am. Rena*, 2012 WL 12538385, at *6 & n.3 (concluding that declarations from two consumers evidencing actual confusion sufficed to establish a likelihood of actual confusion, even in the face of "several declarations of customers who claim that they were not confused" submitted by the defendants).

34

As for the final factor, "[t]his factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Id.* (quoting *Brookfield*, 174 F.3d at 1059). As the Court has already noted, *see supra* Section I.B, DESSLoc® was created directly in response to inquiries from Defendants' Spanish customers as to whether they "had a product compatible with Zest's LOCATOR® abutment." (*See* Terrats Decl. ¶ 10.) Further, "[t]here is no logical reason for [Defendants'] precise copying save an attempt to realize upon a secondary meaning that is in existence." (*See* Mot. at 20 (second alteration in original) (quoting *Transgo*, 768 F.2d at 1016). The Court therefore concludes that this final *Sleekcraft* factor favors Plaintiffs.

"The seven relevant [*Sleekcraft*] factors *all* point to a likelihood of confusion on the part of consumers, and thus it is likely Plaintiffs will be able to prove trade[ dress] infringement." *See Am. Rena*, 2012 WL 12538385, at *7 (emphasis in original). Accordingly, the Court concludes that Plaintiffs have established that consumers are likely to be confused by the similarity of Defendants' DESSLoc® products to the LOCATOR® Product Suite.

### D.    Conclusion

Based on the above analysis, the Court concludes that Plaintiffs have established a likelihood of probable success on the merits for their trade dress infringement claim.

## II.    Likelihood of Irreparable Harm

Because the Court concludes that Plaintiffs have established a likelihood of success on the merits, *see supra* Section I, "[b]y statute, [Plaintiffs are] entitled to a rebuttable presumption of irreparable harm on [their] trademark claim because the compan[ies] ha[ve] shown [they] will likely succeed on the merits." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682 (9th Cir. 2022) (citing 15 U.S.C. § 1116(a)). "Notwithstanding this presumption," Plaintiffs also argue that they will suffer irreparable harm because Defendants infringement will "harm Zest's reputation and brand . . . , damage Zest's sales, and . . . diminish[] Zest's goodwill and business." (*See* Mot. at 28–29.) For their part,

Defendants attempt to rebut the presumption of irreparable harm on two grounds: (1) Plaintiffs delayed in seeking preliminary injunctive relief, (*see* Opp'n at 27–28); and (2) Plaintiffs have unclean hands. (*See id.* at 28–29.) Defendants also contend that Plaintiffs fail to establish more than a "possibility" of irreparable harm, which does not suffice. (*See id.* at 29–30.)

First, Defendants contend that Plaintiffs are not entitled to a presumption of irreparable harm because they waited nearly five years after learning that Defendants were offering their DESSLoc® products in the United States to seek injunctive relief. (*See id.* at 27–28.) Plaintiffs do not dispute that they first learned of Defendants' alleged infringement "[i]n the summer of 2017," (*see* Stratton Decl. ¶ 33), but that they failed to file suit or seek preliminary injunctive relief until early 2022. (*See generally* ECF Nos. 1, 15.) Plaintiffs respond, however, that "there has been no delay in seeking relief . . . [because they] quickly sought relief when DESS's partnership with Zimmer Biomet presented immediate, material, and irreparable harm." (*See* Reply at 13 (citing *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)).)

The Ninth Circuit has explained that "[u]sually, delay is but a single factor to consider in evaluating irreparable injury; courts are 'loath to withhold relief solely on that ground.'" *Arc of Cal.*, 757 F.3d at 990 (quoting *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)). Consequently, "[a]lthough a plaintiff's failure to seek judicial protection can imply the lack of need for speedy action . . . , such tardiness is not particularly probative in the context of ongoing, worsening injuries." *Id.* (internal quotation marks and citation omitted). For example, it may "undermin[e] any inference that the plaintiff was sleeping on its rights" if "the magnitude of the potential harm becomes apparent gradually." *Id.* at 990–91. Similarly, a delay in seeking injunctive relief may be reasonable where the plaintiff monitors the situation and decides to sue only when the alleged infringer "expand[s] . . . into a real threat." *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017). In other words, "[u]nder [certain] circumstances, waiting to file for preliminary relief until a credible case for irreparable harm can be made

is prudent rather than dilatory[, and t]he significance of such a prudent delay in determining irreparable harm may become so small as to disappear." *See Arc of Cal.*, 757 F.3d at 991.

The Court concludes that Plaintiffs were not dilatory here.  Beginning when Plaintiffs discovered Defendants' alleged infringement, they exchanged correspondence through counsel and began monitoring Defendants' actions.  (*See* Stratton Decl. ¶ 36.) Until Defendants partnered with Zimmer Biomet in late 2021, sales of DESSLoc® products through United-States-based distributors—although trending up—were modest, averaging only $▮▮▮▮▮ per year for 2018 through 2021.  (*See* Terrats Decl. ¶ 33.) Plaintiffs, on the other hand, averaged approximately $▮▮▮▮ per month—or $▮▮▮▮ per year—in sales to Zimmer Biomet alone during that period, (*see* Stratton Decl. ¶ 41), with its average annual revenue from LOCATOR® products averaging $▮▮▮▮ since 2012.  (*See* Stratton Decl. ¶ 29.)  It is therefore reasonable that Plaintiffs only considered Defendants' alleged infringement to pose a legitimate "threat" when they learned that Defendants had partnered with Zimmer Biomet.  (*See* Stratton Decl. ¶ 41); *see also Disney Enters.*, 869 F.3d at 866 (affirming district court's finding of irreparable harm where approximately one-year delay was result of the plaintiffs' "cautious investigation" of the defendant's allegedly infringing service and the plaintiffs decided to sue when the alleged infringement "expanded . . . into a real threat"); *Arc of Cal.*, 757 F.3d at 990–91 (reversing district court's conclusion that two-year delay weighed against irreparable harm where delay was unlikely to be probative given existence of "ongoing, worsening injuries").  Under these circumstances, Plaintiffs' "delay" in seeking preliminary injunctive relief therefore does not rebut the presumption of irreparable harm.

Second, Defendants contend that Plaintiffs have unclean hands because Plaintiffs' website is "contributing to (and likely benefiting from) an alleged association between Zest and Zimmer Biomet."  (*See* Opp'n at 28–29.)  Plaintiffs respond that "these references [to Zimmer Biomet-compatible products] are hardly sufficient to establish unclean hands." (*See* Reply at 13 (citing *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015)).)  "Trademark law's unclean hands defense springs from the rationale that 'it

is essential that the plaintiff should not in his trade[]mark, or in his advertisements and business, be himself guilty of any false or misleading representation.'" *Japan Telecom*, 287 F.3d at 870 (quoting *Worden v. Cal. Fig Syrup Co.*, 187 U.S. 516, 528 (1903)). "To make out an unclean hands defense, a trademark defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 368 (9th Cir. 2017) (internal quotation marks omitted) (quoting *Japan Telecom*, 287 F.3d at 870). "To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers." *Id.* (quoting *Japan Telecom*, 287 F.3d at 870). "Bad intent is the essence of the defense of unclean hands," *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) (citing *Wells Fargo & Co. v. Stagecoach Props., Inc.*, 685 F.2d 302, 308 (9th Cir. 1982)), and mere negligence will not suffice. *See, e.g.*, *id.*; *see also FLIR Sys., Inc. v. Sierra Media, Inc.*, 965 F. Supp. 2d 1184, 1194 (D. Or. 2013) (quoting *Infineon Techs. AG v. Volterra Semiconductor Corp.,* No C 11–6239 MMC, 2013 WL 1832558, at *4 n. 7 (N.D. Cal. May 1, 2013)).

The Court concludes that there is no evidence of such intentional deception here. Plaintiffs explain on reply that Defendants "brought to Zest's attention a page on Zest's website . . . that was out of date," which Zest is now in the process of updating. (*See* Supp. Stratton Decl. ¶ 5.) Plaintiffs note that their other statements regarding compatibility are truthful, (*see id.* ¶ 6), but that Plaintiff has updated its website "[f]or the avoidance of any doubt." (*See id.* ¶ 7.) Even assuming that this conduct rises to the level of negligence, it would still fall far short of establishing "bad intent." Accordingly, the Court concludes that Defendants have failed to rebut the presumption that Plaintiffs will be irreparably harmed.

Even if Plaintiffs were not entitled to the presumption of irreparable harm, however, the Court would conclude that Plaintiffs have introduced sufficient evidence to establish a likelihood of irreparable harm. "'[E]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' so long as there is concrete

evidence in the record of those things." *adidas*, 890 F.3d at 756 (alterations in original) (quoting *Herb Reed*, 736 F.3d at 1250). For example, "extensive and targeted advertising and unsolicited media, along with tight control of the supply of [LOCATOR® products], [can] demonstrate that [Plaintiffs] ha[ve] built a specific reputation around the [LOCATOR® Product Suite] with 'intangible benefits.'" *See id.* at 756–57 (citing *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519 (9th Cir. 1984)). Further, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37–38 (2d Cir. 1995)).

Although Defendants contend that Plaintiffs "present[] no evidence of actual loss or tangible harm," (*see* Opp'n at 29–30), the Court disagrees and concludes that Plaintiffs introduce sufficient evidence to establish a likelihood of irreparable harm. Here, Plaintiff introduce uncontroverted evidence that they have spent significant amounts of money advertising the LOCATOR® Product Suite, averaging approximately $███████ per year over the last decade. (*See* Stratton Decl. ¶ 23.) As a result, the LOCATOR® Product Suite has won numerous, third-party awards, (*see id.* ¶¶ 30–31), and has become "the most popular and widely used denture attachment system in the world." (*See id.* ¶ 5.) Until Defendants' DESSLoc® products entered the scene, Plaintiffs had a lucrative partnership with Zimmer Biomet worth approximately $██████ per year. (*See id.* ¶ 41.) Zimmer Biomet, however, is currently taking orders for Defendants' allegedly infringing products—which previously had sold a maximum of approximately $█████ per year in the United States, (*see* Terrats Decl. ¶ 33)—through its website. (*See* Towse Decl. ¶ 29.) Purchasers through Zimmer Biomet already have expressed confusion, (*see* Scherer Decl. ¶¶ 21–23), and, if Defendants are permitted to ship their DESSLoc® products under the OverdenSURE mark pursuant to their new partnership with Zimmer Biomet to customers who previously had purchased the LOCATOR® Product Suite under that same name, (*see* Towse Decl. ¶ 29), it is likely that Plaintiffs will suffer harm that cannot be remedied by

monetary damages in the form of loss of customers and loss of goodwill.  Accordingly, the Court concludes that Plaintiffs have established a likelihood, as opposed to a mere "possibility," of irreparable harm.

## III.   Balance of Equities

Plaintiffs contend that "[a]ny harm to DESS's business is of its own making given that . . . DESS has intentionally sought to market and sell products nearly identical to Zest's and has recently entered into a distribution agreement to sell knock-off LOCATOR® products *via* Zimmer Biomet." (*See* Mot. at 29–30 (emphasis in original).)  Defendants counter that the balance of equities does not favor Plaintiffs because Defendants have been selling DESSLoc®—with Plaintiffs' knowledge—for nearly five years, meaning that "Zest's requested remedy . . . goes 'well beyond maintaining the status quo.'" (*See* Opp'n at 30 (first citing *Signeo USA, LLC v. SOL Republic, Inc.*, No. 5:11-cv-06370-PSG, 2012 WL 2050412 at *11 (N.D. Cal. June 6, 2012); then citing *Wild v. HarperCollins Publishers LLC*, No. 8:12-cv-01191-JST (ANx), 2013 WL 12137684, at *3 (C.D. Cal. Jan. 2, 2013)).)

While it is true that a preliminary injunction is meant to maintain the status quo, Defendants misinterpret its scope:  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy[.]'"  *GoTo.com*, 202 F.3d at 1210 (quoting *Tanner Motor Livery*, 316 F.2d at 809).  In this case, that would be before Defendants began marketing and selling their allegedly infringing DESSLoc® products in the United States. *See id.* (concluding that status quo existed before the defendant had begun using its allegedly infringing logo, not before the plaintiff had filed suit).

In any event, Plaintiffs are correct that, "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument . . . 'merits little equitable consideration.'"  *Cadence Design Sys. v. Avant! Corp.,* 125 F.3d 824, 829 (9th Cir. 1997) (alteration in original) (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *superseded by statute on other grounds*, 17 U.S.C. § 117(c)) (collecting cases).  Here, Defendants continued to sell and

market DESSLoc® even after receiving correspondence from Plaintiffs' counsel regarding their alleged infringement.  (*See, e.g.*, Stratton Decl. ¶¶ 36–38; Terrats Decl. ¶¶ 26–28.)  Because Plaintiffs have shown a likelihood of success on the merits, "the balance of hardships issue cannot be accorded significant—if any—weight in determining whether a court should enter a preliminary injunction."  *See Cadence Design*, 125 F.3d at 830.  The Court therefore concludes that Plaintiffs have established that the equities favor granting them the requested preliminary injunctive relief.

## IV.   Public Interest

Finally, Plaintiffs contend that the requested preliminary injunction would serve the public interest because "[o]ne of the essential purposes of trademark law is to protect consumers from confusion."  (*See* Mot. at 30 (citing *Park 'N Fly, Inc. v. Dollar Park & Fly*, 469 U.S. 189, 198 (1985); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1029 (C.D. Cal. 2011)).)  Defendants respond that, "even if the Court were to find a likelihood of consumer confusion, that harm does not outweigh the public's interest in ready access to, and a robust market for, FDA approved medical devices."  (*See* Opp'n at 31.)

Defendants cite several cases to support their position.  (*See id.* at 31 & n.10 (first citing *Nutrishare, Inc. v. BioRx, LLC*, No. 08 CV 1493 JM BLM, 2008 WL 4748109, at *5 (S.D. Cal. Oct. 23, 2008); then citing *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2012 WL 44064, at *3–4 (N.D. Cal. Jan. 9, 2012); then citing *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C95-03577-DLJ, 2008 WL 4647384, at *11 (N.D. Cal. Oct. 20, 2008); finally citing *HDOS Franchise Brands, LLC v. El Paso Hot Dog, LLC*, No. 321CV00201AJBBLM, 2021 WL 5629923, at *8 (S.D. Cal. June 29, 2021)).)  Not only are none of those cases binding on this Court, all can be distinguished from the instant case as well.

First, the Court in *HDOS* concluded that the public interest supported issuance of a preliminary injunction because "[t]he public . . . has a strong interest in being free from confusion due to [the d]efendants' infringing conduct."  *See* 2021 WL 5629923, at *8.  This

is the exact argument Plaintiffs advance here. *HDOS* therefore simply does not support Defendants' position.

Second, the party seeking the preliminary injunction in *Nutrishare* "fail[ed] to demonstrate a strong or probable likelihood of success on its trademark claims or that it w[ould] suffer irreparable harm if a preliminary injunction is not granted." *See* 2008 WL 4748109, at *6. Unlike in *Nutrishare*, however, the Court here concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits, *see supra* Section I, and that Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted. *See supra* Section II. Further, the court in *Nutrishare* found that the public interest factor was "not substantial" because both of the parties' positions—plaintiff's argument concerning avoidance of confusion and the defendant's argument concerning the effect the injunction would have on "healthy competition in the market" and "patients who rely on its products"—had "some merit." *See id.* at *5. Accordingly, *Nutrishare*—at best—supports a conclusion that the public interest factor is of minimal relevance here.

Third, *Conceptus* involved a motion for a permanent injunction following a patent-infringement trial for a contraceptive product, *see* 2012 WL 44064, at *1, where the two products were "not interchangeable products and procedures" and "[e]njoining the sale of [the infringing product] would leave only one product for transcervical hysteroscopic sterilization." *See id.* at *3. Here, by contrast, the products are interchangeable, (*see* Terrats Decl. ¶¶ 10–11 (explaining that DESSLoc® was developed to be compatible with LOCATOR®)), and there are other, non-infringing products available. (*See* Reply at 14.)

Finally, *Advanced Cardiovascular Systems* concerned a motion to modify a permanent injunction entered eight years prior following a patent-infringement trial, *see* 2008 WL 4647384, at *1, *3, meaning the plaintiff had enjoyed permanent injunctive relief for *eight years* before the court decided to dissolve the injunction. The plaintiff in that case also had licensed the patented product in contention to other companies over those eight years, indicating that money damages were sufficient. *See id.* at *10. And, as in *Conceptus* / / /

42

but unlike in this case, enjoining the sale of the infringing product would leave only one device available to the market. *See id.* at *11.

In short, this is not a situation in which enjoining Defendants' allegedly infringing DESSLoc® products would leave consumers without viable alternative denture attachment products. Indeed, Defendants characterize the market for their products as "crowded." (*See* Opp'n at 21–23.) On the other hand, allowing Defendants to continue to market and sell their allegedly infringing DESSLoc® products pending final adjudication of Plaintiffs' trade dress infringement claims would risk consumer deception or confusion. Under these circumstances, the Court concludes that the public interest weighs in favor of Plaintiffs.

## V.   Weighing of the Factors

Because the Court concludes that Plaintiffs have demonstrated both a likelihood of probable success on the merits, *see supra* Section I, a likelihood of irreparable harm, *see supra* Section II, and that all four of the *Winter* factors favor preliminary injunctive relief, *see supra* Sections I–IV, the Court also concludes that Plaintiffs have established that they are entitled to their requested preliminary injunctive relief under either of the Ninth Circuit's variant standards.

## VI.   Bond

Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c) (emphasis added). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.*'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). "The district court is afforded wide discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999)).

/ / /

Because "the purpose of . . . a bond is to cover any costs or damages suffered by the [party sought to be enjoined], arising from a wrongful injunction," *see Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000), "the party affected by the injunction [bears the] obligation of presenting evidence that a bond is needed." *See Conn. Gen*, 321 F.3d at 883; *accord Gorbach*, 219 F.3d at 1092 (affirming district court's decision not to require bond where the party sought to be enjoined "did not show that there would be any" damages). Consequently, if the party affected by the injunction fails to request a bond or submit any evidence regarding its likely damages, the court does not abuse its discretion by setting a bond of zero. *See Conn. Gen*, 321 F.3d at 882–83.

Defendants did not request—or in any way address—bond until the Court asked at oral argument whether Defendants' failure to do so was an intentional waiver. (*See generally* Opp'n; *see also* 06/09/22 Tr.)  Accordingly, the Court would be well within its discretion to decline to require Plaintiffs to post any bond here. *See Conn. Gen*, 321 F.3d at 882–83; *Am. Rena*, 2012 WL 12538385, at *9 (waiving bond requirement where the "[d]efendants have not addressed the amount of the bond and have failed to respond to [the p]laintiffs' contention that no bond is required").

Nonetheless, Defendants did request "at minimum a ███████ dollar bond" at oral argument based on *Plaintiffs'* historic monthly sales of the LOCATOR® Product Suite to Biomet Zimmer.  (*See* 06/09/22 Tr.; *see also* Stratton Decl. ¶ 41.)  Defendants, however, made only $████ from sales of DESSLoc® to distributors with U.S. addresses between 2017 and the filing of their Opposition.  (*See* Terrats Decl. ¶ 33.)  On this record, Defendants—who bear the burden of proving their likely damages arising from the issuance of a wrongful injunction—fail to establish their entitlement to the requested bond.

Accordingly, the Court **ORDERS** supplemental briefing as to the necessity and appropriate amount of a bond in this case.  Defendants **SHALL FILE** a supplemental brief accompanied by all evidence necessary to support their request for bond pursuant to Federal Rule of Civil Procedure 65(c) within two (2) weeks of the electronic docketing of this Order.  Plaintiffs **MAY FILE** a response within two (2) weeks of service of

Defendants' supplemental brief.  Upon closing of the supplemental briefing, the Court will take the bond issue under submission on the papers pursuant to Civil Local Rule 7.1(d)(1) unless the Court determines that additional briefing or oral argument is required.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion (ECF No. 15).  Specifically, the Court **GRANTS** Plaintiffs' Motion as to the LOCATOR® Trade Dress but **DENIES** Plaintiffs' Motion as to the Zest Insert Color Marks.  Accordingly, the Court **ENJOINS AND RESTRAINS** until the entry of final judgment in this action Defendants Geryon Ventures, LLC d/b/a DESS-USA, and Terrats Medical Sociedad Limitada, together with their agents, employees, representatives, and all persons and entities in concert or participation with them from engaging in, committing or performing, directly or indirectly, any and all of the following acts:

1.     Using in any way, including in connection with the promotion, marketing, advertising, and sale of products or services, Zest's LOCATOR® product suite trade dress or any trade dress that is a colorable imitation thereof, or confusingly similar thereto; and

2.     Importing into the United States any products that use the LOCATOR® product suite trade dress or trade dress that is a colorable imitation thereof, or confusingly similar thereto.

Finally, the Court **DECLINES** to impose a bond in this Order but **ORDERS** Defendants to file a fully supported supplemental brief regarding the necessity and appropriate amount of any bond in this case within <u>two (2) weeks</u> of the electronic docketing of this Order.  Plaintiffs **MAY FILE** an optional response within <u>two (2) weeks</u> of service of Defendants' supplemental brief.

**IT IS SO ORDERED.**

Dated:  July 18, 2022

_____
Honorable Todd W. Robinson
United States District Judge